# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRAVELPORT LIMITED, TRAVELPORT LLC,
AND TRAVELPORT INC.,

                Plaintiffs,

      v.

COMPUTERSHARE TRUST COMPANY, N.A., as
Trustee,

                Defendant;

Case No. 11 Civ. 7704 (PKC)
ECF Case

**AMENDED ANSWER AND
COUNTERCLAIMS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMPUTERSHARE TRUST COMPANY, N.A., as
Trustee,

                Counterclaimant,

      v.

TRAVELPORT LIMITED, TRAVELPORT LLC,
TRAVELPORT INC., AND TRAVELPORT
HOLDINGS LIMITED,

                Counterclaim
                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Computershare Trust Company, N.A. ("Computershare" or the "Trustee"), by and

through its undersigned counsel and solely in its capacity as trustee under the Indentures (as

defined below),[1] for its answer to the Amended Complaint for Declaratory Judgment (the

"Amended Complaint") filed on November 3, 2011 by Plaintiffs Travelport Limited

---

[1] In a letter dated December 9, 2011, counsel for the original defendant, The Bank of Nova Scotia Trust Company of New York (the "Initial Trustee"), advised the Court that it had resigned as trustee under the Indentures. On January 19, 2012, Travelport appointed Computershare as successor trustee to the Initial Trustee pursuant to Section 7.08 of the Indentures.

("Holdings"), Travelport LLC ("Opco"), and Travelport Inc. (together with Holdings and Opco, "Plaintiffs" or "Travelport"), responds as follows:

1.    The Trustee admits that, on September 19, 2011, Holdings filed its report under Form 8-K respecting the announcement by the Company's indirect parent, Travelport Holdings Limited (the "PIK Borrower"), of an "agreement in principal [sic]" for a proposed transaction involving the PIK Borrower's senior unsecured payment-in-kind term loans (the "PIK Loans"). The Trustee otherwise denies the allegations in paragraph 1.

2.    The Trustee refers to the September 22 Letter[2] for a full and accurate rendition of its contents and otherwise denies the allegations in paragraph 2.

3.    The Trustee admits that counsel for certain legal and/or beneficial owners of Senior Notes (as defined below) issued and guaranteed by Travelport sent a letter dated September 27, 2011 to Travelport and the PIK Borrower and refers to that letter for a full and accurate rendition of its contents.  The Trustee otherwise denies the allegations in paragraph 3.

4.    The Trustee refers to the September 22 Letter and the September 27 Letter for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 4.

5.    The Trustee denies the allegations in paragraph 5.

6.    The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 6 and on that basis denies the allegations.  The remaining allegations in paragraph 6 state legal conclusions to which no response is required.

7.    The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 7 and on that basis denies the allegations.

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Amended Complaint or the Indentures, as appropriate.

8.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 8 and on that basis denies the allegations.

9.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 9 and on that basis denies the allegations.

10.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of paragraph 10 and on that basis denies the allegations.  The Trustee further notes that Computershare is the successor trustee to The Bank of Nova Scotia Trust Company of New York.  The remaining allegations in paragraph 10 state legal conclusions to which no response is required.

11.      The Trustee responds that the allegations in paragraph 11 state a legal conclusion to which no response is required.

12.      The Trustee responds that the allegations in paragraph 12 state a legal conclusion to which no response is required.

13.      The Trustee responds that the allegations in paragraph 13 state a legal conclusion to which no response is required.

14.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 14 and on that basis denies the allegations.

15.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 15 and on that basis denies the allegations.

16.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 16 and on that basis denies the allegations.

17.      The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 17 and on that basis denies the allegations.

18.     The Trustee lacks knowledge or information sufficient to form a belief as to whether "Opco" is "an indirect wholly owned subsidiary of PIK Borrower," but otherwise admits the allegations in paragraph 18.

19.     The Trustee admits the allegations in paragraph 19.

20.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 20 and on that basis denies the allegations.

21.     The Trustee admits the allegations in paragraph 21.

22.     The Trustee admits the allegations in paragraph 22.

23.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 23 and on that basis denies the allegations.

24.     The Trustee admits the allegations in paragraph 24.

25.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 25 and on that basis denies the allegations.

26.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 26 and on that basis denies the allegations.

27.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 27 and on that basis denies the allegations.

28.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 28 and on that basis denies the allegations.

29.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 29 and on that basis denies the allegations.

30.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 30 and on that basis denies the allegations.

31.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 31 and on that basis denies the allegations.

32.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 32 and on that basis denies the allegations.

33.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 33 and on that basis denies the allegations.

34.     The Trustee refers to the September 22 Letter, the September 23 Letter and the September 27 Letter for a full and accurate rendition of their contents and otherwise responds that it lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in paragraph 34 and on that basis denies the allegations.

35.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 35 and on that basis denies the allegations.

36.     The Trustee refers to the September 22 Letter for a full and accurate rendition of its contents and otherwise denies the allegations in paragraph 36.

37.     The Trustee refers to the September 22 Letter and the September 27 Letter for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 37.

38.     The Trustee refers to the September 23 Letter for a full and accurate rendition of its contents and otherwise denies the allegations in paragraph 38.

39.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 39.

40.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 40.

41.     The Trustee admits the allegations in paragraph 41.

42.     The Trustee admits the allegations in paragraph 42.

43.     The Trustee lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 43 and on that basis denies the allegations.

44.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 44.

45.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise admits the allegations in paragraph 45, except to note that there is no Section 4.11(a) in any of the Indentures.

46.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 46.

47.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 47.

48.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 48.

49.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 49.

50.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 50.

51.     The Trustee denies the allegations in paragraph 51.

52.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise admits the allegations in paragraph 52.

53.     The Trustee refers to the September 22 Letter for a full and accurate rendition of its contents and otherwise admits the allegations in paragraph 53.

54.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 54.

55.     The Trustee denies the allegations in paragraph 55.

56.     The Trustee denies the allegations in paragraph 56.

57.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 57.

58.     The Trustee refers to the Indentures for a full and accurate rendition of their contents and otherwise denies the allegations in paragraph 58.

59.     The Trustee refers to the September 22 Letter for a full and accurate rendition of its contents and otherwise denies the allegations in paragraph 59.

60.     The Trustee denies the allegations in paragraph 60, but agrees that, in order to qualify as an Unrestricted Subsidiary, Travelport Guarantor must, among other things, "abide by the requirements set forth in subsection (3) of the 'Unrestricted Subsidiary' definition" quoted in paragraph 58 of the Amended Complaint.  The Trustee avers that consummation of the Restructuring would cause Travelport Guarantor to violate those requirements.

61.     The Trustee refers to the September 22 Letter for a full and accurate rendition of its contents and otherwise admits the allegations in paragraph 61.

62.     The Trustee denies the allegations in paragraph 62.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

63.     The Trustee repeats the responses contained in paragraphs 1 through 62 above as if fully set forth herein.

64.     The Trustee responds that the allegations in paragraph 64 state a legal conclusion to which no response is required.

65.     The Trustee admits the allegations in paragraph 65.

66.     The Trustee admits the allegations in paragraph 66.

67.     The Trustee denies the allegations in paragraph 67 and avers that the proposed $135 Million Investment and the further transactions described in paragraph 33 of the Amended Complaint would violate, *inter alia*, §§ 4.07, 4.09, 4.10, 4.11, 4.12, and 4.15 of the Indentures.

### REQUEST FOR RELIEF

The Trustee denies that Plaintiffs are entitled to any relief and requests that the Court adjudge, decree and declare that the "$135 Million Investment" (as defined in the Amended Complaint) and the further transactions described in paragraph 33 of the Amended Complaint would violate, *inter alia*, §§ 4.07, 4.09, 4.10, 4.11, 4.12, and 4.15 of the Indentures (defined below) and that, after notice and lapse of time, an Event of Default under the Indentures would occur if the proposed Restructuring is consummated.

### DEFENDANT'S COUNTERCLAIMS

The Trustee, by and through its undersigned counsel and solely in its capacity as trustee under the Indentures, for its Amended Counterclaims against Travelport and the PIK Borrower, alleges on its own knowledge or otherwise on information and belief, as follows:

### NATURE OF THE COUNTERCLAIMS

1.     The Amended Counterclaims arise from the recent restructuring of certain of the PIK Borrower's debt obligations.  Specifically, on September 19, 2011, Holdings announced its parent holding company's, the PIK Borrower's, proposed Restructuring of its senior unsecured payment-in-kind term loans (the "PIK Loans"), largely through the incurrence and transfer of $342.5 million of new debt of Opco secured by Opco assets transferred through Holdings for the ultimate benefit of Holdings' parent, the PIK Borrower.

2.      On September 22, 2011, the legal and/or beneficial owners of certain Senior Notes issued by Opco and Travelport Inc. (the "Noteholders"), through their counsel, advised Travelport of their position that consummation of the PIK Borrower's proposed Restructuring would result in (i) one or more defaults and Events of Default under the Indentures and (ii) certain fraudulent transfers.  (*See* September 22 Letter.)  The Noteholders therefore demanded that Travelport "cease and desist from taking any steps to document or consummate the Restructuring."  (*Id.*)

3.      On September 23, 2011, The Bank of Nova Scotia Trust Company of New York, as trustee ("Initial Trustee"), followed up with a separate letter to Travelport noting that it had been contacted by several Noteholders who had raised questions with regard to the effect of the Restructuring on Travelport's ability to comply with its covenants under the Indentures, and requesting that Travelport "be so kind as to provide [the Initial Trustee] a response, with sufficient detail, to answer the questions raised by some of the note holders together with your and/or your counsels [sic] views on the permissibility of this transaction under the applicable covenants of the relevant indentures that we may be able to forward to the note holders in response to their concerns."  (September 23 Letter.)

4.      Notwithstanding the concerns expressed by the Noteholders, on October 3, 2011, Travelport and certain of its affiliates consummated a significant portion of the transactions contemplated by the Restructuring.  First, Opco was caused to issue Second Lien Term Notes to Holdings in an aggregate principal amount of $342.5 million (split into a $135 million secured Tranche A Opco Note and a $207.5 million secured Tranche B Opco Note) (together, the "Second Lien Secured Opco Notes") in exchange for an intercompany note from Holdings. Second, Holdings made a dividend to its parent holding company, the PIK Borrower, consisting

of the $207.5 million secured Tranche B Opco Note and $89.5 million in cash, which Opco

transferred to Holdings for this purpose.  Third, the PIK Borrower transferred the $207.5 million

secured Tranche B Opco Note and $85 million in cash to the holders of the PIK Loans (the "PIK

Holders").  The $207.5 million secured Tranche B Opco Note replaced an equal amount of PIK

Loans and the $85 million in cash was treated as a payment on account of the PIK Loans.  The

Trustee believes that, either prior to or as a consequence of these transactions, Opco and

Holdings were, or were rendered, insolvent, unable to pay their debts as they come due, and left

with unreasonably small capital for the business in which they are engaged.

5.     A fourth step in the Restructuring, which Travelport did not consummate, was a

proposed transfer by Holdings of the $135 million secured Tranche A Opco Note to Travelport

Guarantor LLC ("Travelport Guarantor"), a new entity created to guarantee on a secured basis,

using the secured Tranche A Opco Note as collateral, a $135 million PIK Loan issued by the PIK

Borrower as part of the Restructuring.  Instead, Travelport revised the terms of the Restructuring

to condition the Travelport Guarantor step of the Restructuring on first obtaining a court ruling

that this component of the Restructuring is not prohibited by the Indentures.  Accordingly,

Travelport filed its original complaint in this action on October 28, 2011 in an effort to obtain

such a ruling.  On November 3, 2011, Travelport filed its Amended Complaint (the "Amended

Complaint").

6.     The Trustee now seeks (i) to receive a determination as to the occurrence of

certain alleged fraudulent conveyances in the context of the Restructuring and to recover assets

fraudulently conveyed by Opco to Holdings, and by Holdings to, or for the benefit of, the PIK

Borrower, (ii) to annul and set aside obligations fraudulently incurred by Opco, and (iii) to obtain

a judicial determination that Opco and Holdings violated and, if the fourth step in the Restructuring is completed, will again violate their contractual obligations under the Indentures.

## THE PARTIES

**Plaintiffs and Counterclaim Defendants**

7.      Plaintiff and Counterclaim Defendant Holdings is a Bermuda company with its principal place of business in Atlanta, Georgia.

8.      Plaintiff and Counterclaim Defendant Opco is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.

9.      Plaintiff and Counterclaim Defendant Travelport Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.

10.      Counterclaim Defendant PIK Borrower is organized under the laws of Bermuda with its principal place of business in Rye, New York.

**Defendant and Counterclaimant**

11.      Defendant and Counterclaimant Computershare is a federally chartered limited purpose trust company with its headquarters in Canton, Massachusetts.

12.      Computershare is trustee for the Notes (as defined below) under the Indentures (as defined below), but has no direct economic interest in the outcome of this action.

## JURISDICTION

13.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) in that the Counterclaims form part of the same case or controversy as the claims asserted in the Amended Complaint.

## GENERAL ALLEGATIONS

14.     Counterclaim Defendants conduct all of their business operations through Opco and its subsidiaries.  Upon information and belief, Holdings is a holding company whose only material asset is its indirect interest in Opco, and PIK Borrower is a holding company whose only material asset is a direct interest in Holdings.  Neither PIK Borrower nor Holdings contributes or otherwise provides any assets or services used by Opco and its subsidiaries in the businesses conducted by them.

**Debt Issued Pursuant to the Indentures**

15.     In August 2006, Opco issued $150 million aggregate principal amount of senior dollar floating rate notes due 2014, €235 million aggregate principal amount of senior euro floating rate notes due 2014, and $450 million aggregate principal amount of 9 7/8% senior dollar fixed rate notes due 2014 (collectively, the "2006 Senior Notes").  The 2006 Senior Notes were guaranteed by Holdings and certain Restricted Subsidiaries, as described in the Indenture discussed below.  In addition, Opco issued $300 million aggregate principal amount of 11 7/8% senior subordinated dollar notes due 2016 and €160 million aggregate principal amount of 10 7/8% senior subordinated euro notes due 2016 (together, the "Senior Subordinated Notes").  The Senior Subordinated Notes were guaranteed by Holdings and certain Restricted Subsidiaries, as described in the Indenture discussed below.

16.     In August 2010, Opco and Travelport Inc., as co-obligors, issued $250 million aggregate principal amount of 9% senior dollar fixed rate notes due 2016 (the "9% Senior Notes" and, together with the 2006 Senior Notes, the "Senior Notes" and, collectively with the Senior Subordinated Notes, the "Notes").  The 9% Senior Notes were guaranteed by Holdings and certain Restricted Subsidiaries, as described in the Indenture discussed below.

17.     As of September 30, 2011, there was approximately $1.5 billion aggregate principal amount of Notes outstanding.

18.     The 2006 Senior Notes are governed by an Indenture dated as of August 23, 2006, the Senior Subordinated Notes are governed by an Indenture dated as of August 23, 2006, and the 9% Senior Notes are governed by an Indenture dated as of August 18, 2010 (together, the "Indentures").  The Indentures are governed by New York law.

**The PIK Loans**

19.     In March 2007, the PIK Borrower entered into the PIK Loans.  The PIK Loans were not guaranteed by any other entity.  Importantly, prior to the Restructuring, the PIK Loans were in no way obligations of, nor secured by the assets of, either Opco or Holdings.

**The Restructuring**

20.     On September 19, 2011, Holdings filed its report under Form 8-K respecting the announcement of an "agreement in principal [sic]" for a proposed restructuring of the PIK Loans (defined in the Form 8-K as the "Restructuring").

21.     As alleged in the Amended Complaint, Travelport, as a first step in the Restructuring, caused Opco to issue secured notes (secured by a lien on essentially all of Opco's assets) to Holdings in an aggregate principal amount of $342.5 million, consisting of a $207.5 million secured Tranche B Opco Note and a $135 million secured Tranche A Opco Note.  No money was actually loaned to Opco in connection with these notes.  The only purported "consideration" that Holdings provided Opco for these notes was an unsecured intercompany note from Holdings.  As described more fully below, upon information and belief, Holdings did not have any ability to repay the intercompany note and was insolvent or rendered insolvent at

the time of this transaction; thus Opco did not receive reasonably equivalent value for the secured obligations it was made to incur.

22.     As a second step in the Restructuring, Holdings made a dividend to its parent holding company, the PIK Borrower, consisting of (a) $89.5 million in cash, and (b) the $207.5 million secured Tranche B Opco Note, described above, without any consideration.

23.     As a third step in the Restructuring, the PIK Borrower transferred the $207.5 million secured Tranche B Opco Note and $85 million in cash to the holders of the PIK Loans ("PIK Holders").  The $207.5 million secured Tranche B Opco Note replaced $207.5 million of PIK Loans and the $85 million in cash was treated as a payment on account of the PIK Loans.

24.     The Restructuring also contemplated that Holdings would "invest," pursuant to a stock subscription agreement, the $135 million secured Tranche A Opco Note in Travelport Guarantor, a newly-created subsidiary of Holdings, in exchange for the equity of Travelport Guarantor (the so-called "$135 Million Investment," as Plaintiffs refer to it).  Under this plan, Travelport Guarantor would then guarantee $135 million of the PIK Loans and, if these loans were not repaid by September 30, 2012 (a seeming foregone conclusion in light of the PIK Borrower's admitted financial distress), Travelport Guarantor would transfer the $135 million secured Tranche A Opco Note directly to the PIK Holders.  As alleged in Plaintiff's Amended Complaint, however, Travelport revised the terms of the Restructuring, after the Noteholders challenged the Restructuring on numerous grounds, to condition the "$135 Million Investment" on first obtaining a court ruling that this component of the Restructuring is not prohibited by the Indentures.

**The Concerns of the Noteholders**

25.     Just days after Holdings announced the then-proposed Restructuring of the PIK Borrower's debt, the Noteholders, through their counsel, sent the September 22 Letter to Holdings expressing their concern that the Restructuring would result in Events of Default under the Indentures and would be fraudulent transfers.

26.     The Noteholders first challenged the "$135 Million Investment" under Section 4.11 of the Indenture, which provides that "Holdings will not, and will not permit any of its Restricted Subsidiaries to make any . . . transfer or otherwise dispose of any of its properties or assets to . . . or enter into or make or amend any transaction, contract, agreement . . . or guarantee with or for the benefit of any Affiliate of Holdings . . ." unless each of Section 4.11(a)(1) and (2) are satisfied or an exception contained in Section 4.11(b) applies.  In particular, the Noteholders asserted that: (i) the "$135 Million Investment" is not a "Permitted Investment" as defined in the Indenture because there is no expectation of economic return; (ii) Travelport Guarantor's guarantee of $135 million of the PIK Loans—a guarantee secured by the Opco-issued $135 million secured Tranche A Opco Note—is not permitted under the Indenture because Travelport Guarantor would be a Restricted Subsidiary of Holdings as of the time of any determination required under Section 4.11; and (iii) the "$135 Million Investment" is not permitted because it is a transfer *for the benefit* of the PIK Borrower, an Affiliate of Holdings.

27.     The Noteholders also asserted that a number of steps in the Restructuring would constitute fraudulent transfers.

28.     Finally, the Noteholders noted the severe time constraints under which the September 22 Letter was prepared, the absence of any information concerning the Restructuring

beyond what was included in readily-accessible public documents, and that the charges contained in the letter were "preliminary in nature and may be supplemented from time to time."

29.     The Initial Trustee followed up with the September 23 Letter to Travelport, noting that several Noteholders had raised questions with regard to the effect of the Restructuring on Travelport's ability to comply with its covenants under the Indentures, and requesting that Travelport provide a response "to answer the questions raised by some of the note holders together with your and/or your counsels [sic] views on the permissibility of this transaction under the applicable covenants of the relevant indentures that we may be able to forward to the note holders in response to their concerns."

30.     Despite the concerns expressed by the Initial Trustee and the Noteholders, Travelport did not respond, but rather completed the Restructuring, except for conditioning the Travelport Guarantor step of the Restructuring on court approval.

**Fraudulent Conveyances**

31.     As set forth more fully below, upon information and belief, (1) both Opco and Holdings were either insolvent prior to the transfer of cash and the Second Lien Secured Opco Notes to Holdings, and then to or for the benefit of the PIK Borrower, or were rendered insolvent thereby, and (2) the transfer of cash and the Second Lien Secured Opco Notes to Holdings, and then to or for the benefit of the PIK Borrower, also left Opco and Holdings with unreasonably small capital.  In light of these facts, it should have been obvious to Opco and Holdings that they would incur, as a result, debts beyond their ability to pay as they mature.  Accordingly, the issuance of the Second Lien Secured Opco Notes to Holdings, the transfer of the Second Lien Secured Opco Notes ultimately to or for the benefit of the PIK Borrower, and the $89.5 million payment to the PIK Borrower, upon information and belief, constitute fraudulent conveyances

under New York's Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law § 270 *et seq.*
and may be annulled or set aside.

32.     As alleged in Plaintiffs' Amended Complaint, Travelport's economic condition
and solvency were already in serious question even prior to the Restructuring.

33.     As Plaintiffs themselves allege:

> Travelport is currently facing obstacles as a result of the global
> economic downturn, as well as market and industry-wide pressures. . . .
> The prolonged and substantial decrease in global travel volume,
> especially air travel volume, has negatively affected Travelport's
> revenues. . . .  Under more normalized economic and market conditions,
> Travelport believes that it would be able to refinance the PIK loans.
> However, current economic and market conditions limit Travelport's
> options.
>
> Due to these pressures it became evident in early 2011 that a refinancing
> with new indebtedness or repayment of the PIK Loan at maturity would
> be unlikely. . . .  Travelport considered raising capital by way of a public
> offering of equity, but ultimately determined not to proceed with that
> option because of market conditions.

(Pls.' Am. Compl. ¶¶ 25-26.)

34.     Contrary to Travelport's assertions, Travelport's difficulties and inability to
refinance are not solely attributable to macro market headwinds and instead reflect serious issues
regarding the solvency of Opco, Holdings, and the PIK Borrower.  Indeed, Amadeus IT Group
SA, which Travelport has identified as their "most similar public competitor"[3] and was obviously
dealing with the same market headwinds, was able to both refinance its existing debt in May
2011 with a new senior unsecured facility and issue a senior unsecured EUR750 million bond
(approximately $1 billion) at an interest rate of less than 5% in July 2011.  By comparison,
Travelport's refinancing costs for the remaining $287.9 million of PIK Loans as part of the
Restructuring includes interest at LIBOR plus 13.5%.

---

[3] *See* page 75 of Travelport's Disclosure Statement dated September 21, 2011.

35.     That the market recognized that Opco and Holdings were both insolvent or rendered insolvent is reflected by the market prices of Opco's publicly issued and widely traded debt securities, which are guaranteed by Holdings.

36.     Following the announcement of the Restructuring, the 11.875% senior subordinated notes, which had been trading at around $90 at the beginning of August 2011, fell to around $39.  They then fell even further on October 4, 2011, following the Restructuring to a low of $28.

37.     The 9% senior notes traded at $92 in early August 2011, then fell to $73.75 on September 20, 2011, en route to a low of $51 by October 5, 2011.

38.     Finally, the 9.875% senior notes, which had been trading at $94 at the beginning of August 2011, fell to $79 following the announcement of the Restructuring and to a low of $54 by October 5, 2011, following the distributions to the PIK Borrower.

39.     On October 4, 2011, the day following the consummation of the initial steps of the Restructuring, Opco's outstanding publicly traded debt was valued in the market at less than $720 million even though the aggregate principal amount of such debt was approximately $1.5 billion.  None of this debt was issued at a discount.

40.     The movement in the price of certain of the Notes during this period is reflected in the following chart:



Source: CapitalIQ

41.     Prices of credit default swaps referencing Opco debt also increased significantly following the announcement of the Restructuring and, again, following the distributions to the PIK Borrower.

42.     Specifically, as shown in the chart below, the cost to purchase a credit default swap with respect to Opco debt increased from 10% in early August 2011, to over 15% following the announcement of the Restructuring, to over 20% following the dividend of cash and the issuance of the Second Lien Secured Opco Notes to the PIK Borrower:

**Travelport - Senior 5-Year CDS Prices**



*Source: CapitalIQ*

43.     Additionally, on October 5, 2011, Standard & Poor's Rating Services ("S&P")
recognized that the Restructuring involved a distressed exchange and lowered its long-term
corporate credit ratings on Travelport to "SD" (selective default).

44.     As S&P explained in its press release at the time:

"The downgrades follow the implementation of a capital restructuring, which was
necessary because of the Travelport group's high leverage, weak liquidity, and the
upcoming maturity of its USD 693m (as of end-June 2011) PIK loan in March 2012.
According to our criteria, ***we view this restructuring as a distressed exchange and
tantamount to a default***."  (emphasis added)

45.     Opco and Holdings' financial ratios have also, not surprisingly, deteriorated as a
result of the announced Restructuring and the transfer of the Second Lien Secured Opco Notes
and cash through Holdings to or for the benefit of the PIK Borrower.

46. As the charts below show, while Opco and Holdings' debt-to-assets ratio and debt-to-EBITDA ratios continue to increase to even more unsupportable levels, the company's EBITDA-to-interest expense ratio has declined to where $0.67 of every one $1 in EBITDA is used to service Travelport's debt:





47.     Finally, Travelport's Disclosure Statement dated September 21, 2011 included a

valuation of Travelport by Blackstone Advisory Partners L.P. ("Blackstone Advisory") as of

September 30, 2011.  Despite the market trading certain Travelport bonds in the 30s, the

disclosure statement boldly claims, "Based on the Valuation range of $3.9 billion to $4.5 billion,

there is equity value in the Company and the Holders of Allowed PIK Loan Unsecured Claims

are repaid in full."  Putting aside the fact that the company hired to perform the valuation work,

Blackstone Advisory, is part of the same entity that has a significant ownership interest in

Travelport, the underlying assumptions used in the valuation are, upon information and belief,

aggressive given Travelport's historical performance and current economic conditions.

48.     For example, Travelport's financial projections in the Disclosure Statement show

ever increasing net revenue growth of 2.4%, 6.2%, 7.2% and 7.3% in years 2012 thru 2015 for a

compound annual growth rate of 4.6% over a five year period.  These projections were made

despite the fact that (1) as shown in the chart below, Travelport's overall market share has

deteriorated significantly over the past five years and (2) Travelport's net revenue declined by

nearly 9% over the prior five year period.  Given that the terminal value in a DCF model is

highly dependent on the final year of the projection period, applying more conservative revenue

growth rates would significantly lower the Blackstone Advisory valuation range.  Upon

information and belief, conservatively adjusting for the various aggressive assumptions used in

the Blackstone Advisory valuation would show that Travelport was insolvent as of the

Restructuring.



Source: Amadeus IT Holding, S.A. November 2011 Investors Presentation

49.     The foregoing leads to the conclusion that either Opco and Holdings were insolvent before the Restructuring or Opco and Holdings were rendered insolvent as a result of the Restructuring.

**Indenture Violations**

50.     In addition to constituting fraudulent conveyances, the Restructuring also violated – and, if the remaining steps are consummated, will further violate – numerous covenants in the Indentures.

**The Restructuring Violated the Indentures**

51.     Although structured as a series of separate transactions, the overall substance and effect of the Restructuring is (i) to cause Opco to pay the PIK Holders $85 million in cash, (ii) to cause Opco to issue the $207.5 million secured Tranche B Opco Note to the PIK Holders, thereby giving the PIK Holders a claim on Opco's assets, and (iii) to cause Opco to issue the $135 million secured Tranche A Note and thereby give the PIK Holders a further claim on Opco's assets through the release of the Note to the PIK Holders upon the PIK Borrower's expected September 30, 2012 default on the PIK Loans.

52.     A transaction with the substance and effect of the Restructuring violates §§ 4.09, 4.10, 4.11, and 4.12 of the Indentures.

53.     The Restructuring violates § 4.09 of the Indentures, which places restrictions on the amount of Indebtedness Holdings and its Restricted Subsidiaries, such as Opco, are allowed to incur.

54.     Sections 4.09(a) and 4.09(b)(12)(b), together, limit the total aggregate outstanding Indebtedness (of the type evidenced by the secured Tranche A and Tranche B Opco Notes) of Restricted Subsidiaries that are not Guarantors to $200 million.

55.     Opco is a Restricted Subsidiary that is not a Guarantor.

56.     Accordingly, the issuance of the $207.5 million secured Tranche B Opco Note to the PIK Holders violated § 4.09.

57.     The Restructuring also violated § 4.10 of the Indentures, which (except in certain circumstances not applicable here) prohibits Asset Sales by Opco and Holdings.

58.      Opco's payment of $85 million in cash and issuance of the $342.5 million Second Lien Secured Opco Notes to the PIK Holders in the Restructuring constitute prohibited Asset Sales.

59.      The Restructuring also violated § 4.11 of the Indentures, which (except under certain circumstances not applicable here) restricts both Holdings and Restricted Subsidiaries from "mak[ing] any payment to, or sell[ing], leas[ing], transfer[ing] or otherwise dispos[ing] of any of its properties or assets to, or purchas[ing] any property or assets from, or enter[ing] into or mak[ing] or amend[ing] any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of an Affiliate of Holdings . . . ."

60.     The Restructuring is for the benefit of PIK Borrower, which is an Affiliate of Holdings.

61.     Finally, the granting of a lien on Opco's assets to secure the Tranche A Opco Note and Tranche B Opco Note violated § 4.12 of the Indentures, which (except under certain circumstances not relevant here) prohibits Opco from allowing any Lien, other than a Permitted Lien, on its assets, unless extended ratably and equally to the Notes (which has not occurred). The Lien securing the notes is not a Permitted Lien or otherwise permitted under § 4.12 of the Indentures.

**Even Analyzed as a Series of Discrete And Isolated Transactions the Restructuring Violated the Indentures**

62.     Each of the individual steps of the Restructuring, even if viewed as a series of discrete and independent transactions, also violated the Indentures.

**Holdings' Dividend of the $207.5 Million Secured Tranche B Opco Note and $89.5 Million in Cash to PIK Borrower Violated §§ 4.07, 4.09, 4.10, 4.11 and 4.12 of the Indentures**

63.     Section 4.07 of the Indentures places limits on the amount of Restricted Payments that either Holdings or its Restricted Subsidiaries can make, tied, *inter alia*, to benchmarks based on Holdings' Consolidated Net Income and EBITDA.

64.     Holdings' dividend to PIK Borrower of the $207.5 million secured Tranche B Opco Note and $89.5 million in cash (for a total of $297 million) was a Restricted Payment. Accordingly, such a Restricted Payment must comply with § 4.07 of the Indentures.

65.     On September 19, 2011, in connection with the announcement of the proposed Restructuring, Travelport represented that the capacity available to make Restricted Payments under the Indentures (sometimes referred to as the "Restricted Payment basket") was capped at $297 million.

66.     However, Travelport's own contemporaneous statements and other publicly-available information lead to the conclusion that the capacity of the Restricted Payment basket under § 4.07 was significantly lower than $297 million at the time of the Restructuring.

67.     Indeed, just five weeks earlier, on Travelport's August 4, 2011 earnings call for Q2 2011, Travelport's CFO *twice* stated that the capacity of the Restricted Payment basket under the Indentures was only approximately $240 million.

68.     Accordingly, on information and belief, and based on a review and analysis of Travelport's financial statements and other publicly-available information, Holdings' dividend of $297 million violated the limits on Restricted Payments set forth in § 4.07.

69.     Further, under the terms of the Indentures, the violation of § 4.07 ensures that Holdings' dividend to the PIK Borrower also constitutes a violation of both § 4.10 of the Indentures, which prohibits Asset Sales unless an enumerated exception applies, and § 4.11 of the Indentures, which prohibits both Holdings and its Restricted Subsidiaries from engaging in certain transactions with affiliates unless an enumerated exception applies.

70.     Even if there was no violation of §§ 4.07, 4.10 and 4.11, Holdings' dividend to PIK Borrower of the $207.5 million secured Tranche B Opco Note violated the restrictions on Indebtedness contained in § 4.09 of the Indentures.

71.     As alleged above, §§ 4.09(a) and 4.09(b)(12)(b), together, limit the outstanding Indebtedness (of the type evidenced by the secured Tranche A and Tranche B Opco Notes) of any Restricted Subsidiary that is not also a Guarantor under the Indentures, such as Opco, to $200 million in the aggregate.

72.     Moreover, under § 4.09(b)(8) of the Indentures, any transfer of existing Indebtedness of Holdings or a Restricted Subsidiary to any person or entity other than to Holdings or a Restricted Subsidiary is deemed to be an incurrence of such Indebtedness.

73.     The PIK Borrower is not a Restricted Subsidiary.

74.     Accordingly, Holdings' transfer to PIK Borrower of the $207.5 million secured Tranche B Opco Note is an incurrence of $207.5 million in Indebtedness by Opco.

75.     As such, that transfer violated the $200 million aggregate cap on Indebtedness set forth in §§ 4.09(a) and 4.09(b)(12)(b) of the Indentures.

76.     Further, this step in the Restructuring is also forbidden by § 4.12, which prohibits Opco (except under certain circumstances not relevant here) from allowing any Lien, other than a Permitted Lien, on its assets, unless it grants equal and ratable liens to the Opco Notes.

77.     The Lien securing the Tranche B Opco Note is not a Permitted Lien nor is it otherwise permitted under § 4.12 of the Indentures.

**PIK Borrower's Transfer of the $207.5 Million Secured Tranche B Opco Note to PIK Holders Violated § 4.12 of the Indentures**

78.     PIK Borrower's transfer of the $207.5 million secured Tranche B Opco Note to PIK Holders (which are not Restricted Subsidiaries) also violated § 4.12, for the same reasons § 4.12 prohibited the Lien securing the Tranche B Opco Note prior to the transfer.

## FIRST COUNTERCLAIM

(Violation of New York Debtor and Creditor Law § 273
against Opco, Holdings and the PIK Borrower)

79.     The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

80.     Section 273 of the New York Debtor and Creditor Law provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered

insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  N.Y. Debt. & Cred. Law § 273 (McKinney 2011).

81.     The holders of the Notes are creditors, and Opco and Holdings are debtors, within the meaning of the New York Debtor and Creditor Law.

82.     Upon information and belief, there was no fair consideration exchanged for the issuance of the secured Tranche A and the secured Tranche B Opco Notes or the transfer of the secured Tranche B Opco Note and the $89.5 million payment made to the PIK Borrower.

83.     Upon information and belief, Opco and Holdings were insolvent at the time of these transactions or were rendered insolvent thereby.

84.     Upon information and belief, these transactions were therefore fraudulent conveyances and must be annuled or set aside.

### SECOND COUNTERCLAIM

(Violation of New York Debtor and Creditor Law § 274
against Opco, Holdings and the PIK Borrower)

85.     The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

86.     Section 274 of the New York Debtor and Creditor Law provides that "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."  N.Y. Debt. & Cred. Law § 274 (McKinney 2011).

87.     The holders of the Notes are creditors, and Opco and Holdings are debtors, within the meaning of the New York Debtor and Creditor Law.

88.     Upon information and belief, there was no fair consideration exchanged for the issuance of the secured Tranche A and secured Tranche B Opco Notes or the transfer of the secured Tranche B Opco Note and $89.5 million in cash to the PIK Borrower.

89.     Upon information and belief, these transactions left Opco and Holdings with unreasonably small capital.

90.     Upon information and belief, these transactions were therefore fraudulent conveyances and must be annulled or set aside.

### THIRD COUNTERCLAIM

(Violation of New York Debtor and Creditor Law § 275
against Opco, Holdings and the PIK Borrower)

91.     The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

92.     Section 275 of the New York Debtor and Creditor Law provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 275 (McKinney 2011).

93.     The holders of the Notes are creditors, and Opco and Holdings are debtors, within the meaning of the New York Debtor and Creditor Law.

94.     Upon information and belief, there was no fair consideration exchanged for the issuance of the secured Tranche A and secured Tranche B Opco Notes or the transfer of the secured Tranche B Opco Note and $89.5 million in cash to the PIK Borrower.

95.     In light of the foregoing allegations, upon information and belief, it may be concluded that Opco and Holdings intended or believed that these transactions would result in their incurring debts beyond their ability to pay as they mature.

96.     Upon information and belief, these transactions were therefore fraudulent conveyances and must be annulled or set aside.

### FOURTH COUNTERCLAIM

(Declaratory Judgment against all Counterclaim Defendants:
Restructuring As a Whole Violated the Indentures)

97.     The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

98.     As alleged above, analyzed as a single transaction, rather than a series of independent and isolated transactions, the Restructuring violated §§ 4.09, 4.10, 4.11, and 4.12 of the Indentures.

99.     Whether the Restructuring, viewed as a whole, violated the Indentures is a justiciable and actual controversy between the Trustee and Counterclaim-Defendants.

100.    The Trustee is entitled to a judgment declaring that the Restructuring, as a whole and in its entirety, violated the Indentures and that this constitutes a basis for the Trustee to give notice of a Default and Event of Default under § 6.01 of the Indentures.

### FIFTH COUNTERCLAIM

(Declaratory Judgment against all Counterclaim Defendants:
Holdings' Dividend to PIK Borrower of the $207.5 Million
Secured Tranche B Opco Note and $89.5 Million in Cash Violated
§§ 4.07, 4.09, 4.10, 4.11 and 4.12 of the Indentures)

101.    The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

102.     As alleged above, upon information and belief, Holdings' dividend to PIK Borrower of the secured Tranche B Opco Note and $89.5 million in cash violated §§ 4.07, 4.09, 4.10, 4.11 and 4.12 of the Indentures.

103.     The proper interpretation and application of these sections of the Indentures to the case at hand is a justiciable and actual controversy between the Trustee and Counterclaim-Defendants.

104.     The Trustee is entitled to a judgment declaring that this step of the Restructuring violated the identified provisions of the Indentures and that this constitutes a basis for the Trustee to give notice of a Default and Event of Default under section 6.01 of the Indentures.

## SIXTH COUNTERCLAIM

(Declaratory Judgment against all Counterclaim Defendants: PIK
Borrower's Transfer of the Secured Tranche B Opco Note to PIK
Holders Violated § 4.12 of the Indentures)

105.     The allegations of the foregoing paragraphs are repeated and incorporated by reference as if fully set forth herein.

106.     As alleged above, PIK Borrower's transfer of the secured Tranche B Opco Note to PIK Holders violated § 4.12 of the Indentures.

107.     Whether this stage of the Restructuring violated the Indentures is a justiciable and actual controversy between the Trustee and Counterclaim-Defendants.

108.     The Trustee is entitled to a judgment declaring that this stage of the Restructuring violated the Indentures and that this constitutes a basis for the Trustee to give notice of a Default and Event of Default under section 6.01 of the Indentures.

**WHEREFORE**, the Trustee demands judgment:

A.     Setting aside and invalidating the issuance of the secured Tranche A and secured Tranche B Opco Notes, the transfer of the secured Tranche B Opco Note to PIK Borrower and

the PIK Holders and any subsequent transferee thereof, and the $89.5 million payment to the PIK

Borrower and any subsequent transferee of all or any portion thereof, including the PIK Holders;

      B.      Adjudging, decreeing and declaring the Restructuring, both taken as a whole and

on a step-by-step basis, violated the identified provisions of the Indentures and constitutes a basis

for the Trustee to give notice of a Default and Event of Default under section 6.01 of the

Indentures and the Trustee has authority to give notice thereof to any party to the Restructuring

transaction; and

      C.      For such other and further relief as the Court shall deem just and proper.


Dated:  April 18, 2012

| FOLEY & LARDNER LLP | DEWEY & LEBOEUF LLP |
|---|---|
| By: _____ | By: _____ |
| Barry G. Felder | Bruce S. Bennett (admitted *pro hac vice*) |
| Harold L. Kaplan | Bennett J. Murphy |
| Jeremy L. Wallison | John Schreiber |
| Jonathan H. Friedman | Monika S. Wiener (admitted *pro hac vice*) |
| 90 Park Avenue | 333 South Grand Avenue, Suite 2600 |
| New York, New York 10016 | Los Angeles, California 90071 |
| Telephone: (212) 682-7474 | Telephone: (213) 621-6000 |
| bgfelder@foley.com | Facsimile: (213) 621-6100 |
| hkaplan@foley.com | bbennett@dl.com |
| jwallison@foley.com | bmurphy@dl.com |
| jfriedman@foley.com | jschreiber@dl.com |
| | mwiener@dl.com |

*Attorneys for Computershare Trust Company, N.A., as Trustee*